Filed 5/11/16  P. v. Brown CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>NICHOLAS BRADFORD BROWN,<br><br>  Defendant and Appellant. | B258677<br><br>(Los Angeles County<br>Super. Ct. No.LA062986) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Affirmed.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant Nicholas Brown appeals from the judgment entered following his conviction by jury of robbery, attempted robbery, and assault with a deadly weapon, arising from incidents at two medical marijuana dispensaries. He contends there was insufficient evidence to sustain his conviction for attempted robbery because the employee fled as soon as defendant brandished a weapon. Defendant further contends the trial court failed to adequately consider mitigating factors when sentencing him to consecutive terms on the four counts of robbery. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

A.    *Procedural Background*

The Los Angeles County District Attorney (the People) filed an amended information on April 21, 2014 charging defendant with second-degree robbery (Pen. Code, § 211[1]; counts 1-4 and 8-9), attempted second-degree robbery (§§ 664, 211; count 5), attempted murder (§§ 664, 287, subd. (a); count 6), and assault with a semiautomatic firearm (§ 245, subd. (b); count 7). The information further alleged that defendant personally used a handgun (§ 12022.53, subd. (b); counts 1-4, 6, and 8-9), personally and intentionally discharged a handgun causing great bodily injury (§ 12022.53, subds. (c), (d); counts 5-6), and personally used a handgun and inflicted great bodily injury upon the victim (§ 12022.5, subd.(a), § 12022.7, subd. (a); count 7). As to counts 8 and 9, the information alleged that at the time of the commission of the offenses, defendant was released from custody on bail or own recognizance (§ 12022.1).

At the conclusion of the jury trial, the court granted the defense motion for acquittal as to count 9. The jury found defendant guilty on counts 1 through 5 and 7. The jury further found true each of the special allegations as to those counts. The trial court found the jury hopelessly deadlocked on counts 6 and 8, declared a mistrial, and dismissed those counts.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

2

The court denied probation and sentenced defendant to 27 years to life in state prison on count 5, comprised of a base term of the mid-term of two years, plus 25 years to life for the enhancement pursuant to section 12022.53, subdivision (d). The court further imposed four years and four months on counts 1 through 4, comprised of one year for each count (one-third the mid-term), plus 40 months for the firearm enhancements pursuant to section 12022.53, subdivision (b), each to run consecutive to count 5. Finally, the court imposed a term of 13 years on count 7 but stayed that sentence pursuant to section 654. Defendant timely appealed.

B.     *Evidence at Trial*[2]

The prosecution presented evidence that defendant was involved in an armed robbery of a medical marijuana dispensary on May 23, 2009 and then in an attempted armed robbery of another dispensary on August 15, 2009, during which defendant shot an employee. Along with testimony at trial by employees from both dispensaries, the People played footage and showed photographic stills from surveillance videos taken during both incidents. Defendant does not contest his participation in either incident on appeal; thus, we have excluded from our discussion much of the evidence presented at trial regarding identification.

1.     *May 23, 2009 Robbery - Counts 1-4*

In the afternoon on May 23, 2009, defendant and three other armed men robbed Topanga Caregivers, a medical marijuana dispensary. Ryan Salerno testified that he was working that day as a receptionist at the dispensary. He was responsible for letting patients in the front door and then "checking them in," by entering a patient's name into the dispensary computer to confirm that they had a valid medical marijuana recommendation from a physician. The dispensary kept electronic records of its patients, including copies of patients' driver's licenses and physician recommendations. Once a patient had been verified, he or she would be allowed into the locked medicine room where the marijuana was kept. Both the front entry and medicine room doors were kept

_____

[2]We omit the underlying facts of counts 8 and 9, as they were ultimately dismissed and are not the subject of this appeal.

3

locked; the front door had to be opened manually, while the medicine room door could be opened using a buzzer from the reception desk.

On the day of the robbery, Salerno was working at the dispensary with Johnny Bona, Johnny's brother Christopher Bona,[3] and Johnie MacDonald. At approximately 1:30 p.m., Salerno was watching the dispensary surveillance cameras and saw a car drive up to the dispensary. He saw three individuals exit the vehicle and approach the dispensary, so he opened the front door to let them in.

Salerno testified that he "immediately" recognized the first individual as someone who had come into the dispensary a few days prior. Salerno described this person as an African-American male, with a goatee, wearing a hat. He also had a white towel hanging from his pants.[4] Salerno described the second suspect as an African-American male with red sunglasses and a bald head, and the third suspect as a Hispanic male who was "really big."

The three men stood in front of the desk as if they intended to check in. According to Salerno, Suspect 1 "looked like he was going to pull out his wallet to give me his I.D." but instead "pulled out a gun," walked around the desk behind Salerno, and put the gun in Salerno's back. The other two suspects pointed guns at Salerno as well. Suspect 1 began swearing at Salerno and ordered him to buzz open the medicine room, and also slammed Salerno against the door.

Once the medicine room door was open, Suspect 1 pushed Salerno into the medicine room with the gun in his back, followed by the other two suspects. The three other employees were in the medicine room and were told to get on the floor. Suspect 1 "dragged" Salerno into the office, where the dispensary safe was kept, and threatened to shoot him if he did not open the safe. Suspect 1 repeatedly counted down from ten to one, pointing the gun at different parts of Salerno's body, yelling at him to open the safe.

[3]Because they share a surname, we refer to Christopher and Johnny Bona by their first names for clarity.
[4]This individual was alternately referred to as "Suspect 1" and "towel guy" during trial. We refer to the suspects (other than defendant) herein as Suspects 1, 2, and 3. Defendant was identified as Suspect 4.

4

When Salerno said he did not know the code, Suspect 1 hit him in the head with his gun. Suspect 1 then made Salerno open the cash register. Finally Suspect 1 took Salerno to join the other employees, and made him lie face down on the floor. Salerno was hit in the head four times by Suspect 1 over the course of the robbery.

Once Salerno was lying on the floor, he was able to peek to the side to "see what was going on." About five minutes into the robbery, he noticed a fourth suspect (later identified as defendant) enter the medicine room. Defendant was wearing "red shiny basketball shorts and basketball shoes" and a long, white t-shirt. At one point, Salerno saw defendant standing over him, filling up a bag, holding a gun.

MacDonald, a manager at the dispensary, testified that he could hear Salerno "screaming and pleading for his life" as he tried to open the safe. MacDonald started telling the robbers that he could open the safe instead and that Salerno did not know the code. Suspect 1 grabbed MacDonald, put a gun to his head, and had him open the safe. MacDonald was loading marijuana into bags as directed by the robbers when he saw defendant enter. Defendant then hit MacDonald with a gun in the back of his head and MacDonald started bleeding.

The suspects emptied the register and tip jar and cleared "out the rest of the dispensary." Christopher, another manager, estimated that the robbers took a few hundred dollars cash from the register and 10-12 pounds of marijuana. Christopher observed defendant make several trips in and out of the dispensary as the suspects were loading their cars. Then "on his very last trip out he stepped over me, smashed me in the back of the head with the gun, and then ran out."

Once the suspects left, the employees contacted the police and took MacDonald to the hospital because his head was bleeding.

Several of the dispensary employees testified that they recognized Suspect 1 and defendant because both men had come into the dispensary on May 20, 2009, three days before the robbery. Salerno recalled that on that day, Suspect 1 (carrying a white towel over his shoulder) remained in the waiting room the entire time, chatting with Salerno and another patient. Defendant checked in with a valid recommendation and then went

into the medicine room. Salerno said defendant "was acting really shady in the medicine room, trying to buy a bunch of product at once" and "fiddling with his pockets."

Christopher was also present during the visit on May 20. He testified that defendant came into the dispensary that day, asked to see a manager, and then met with Christopher. Defendant pulled out a "giant" stack of money from a paper bag and said he wanted to buy all the marijuana in the dispensary. Christopher said he could only sell defendant a small amount. Christopher recalled feeling "extremely uncomfortable" during this interaction and noted defendant's behavior was unusual. MacDonald also testified that he recognized defendant as having come in a few days prior to the robbery; during that earlier occasion, MacDonald described defendant as "jumpy" and said defendant made him nervous.

Salerno testified that within half an hour of the robbery on May 23, he looked through the driver's license photos in the dispensary files in an attempt to identify Suspects 1 and 4, because he recognized them from their prior visit. Salerno pulled defendant's file, identified defendant as Suspect 4, and gave that file to the police.

2.      *August 15, 2009 Attempted Robbery - Counts 5-7*

The second incident occurred on August 15, 2009 at West Valley Patient Group (West Valley) medical marijuana dispensary. James Tanis, one of the owners of the dispensary, testified that West Valley required new patients to provide a physician's recommendation and a valid identification. For returning patients, Tanis would check their identification and confirm their patient status in the dispensary's computer system.

Footage from the dispensary's surveillance cameras showed that shortly after 10:00 a.m. on August 15, 2009, a red Mercedes pulled into the dispensary parking lot. Tanis testified that he saw two African-American men enter the dispensary, both wearing t-shirts and hats. The man wearing a red hat stayed back near the door, while the man wearing a black hat walked up to the check-in window where Tanis was sitting.[5] Tanis

_____

[5]The prosecution presented evidence that defendant was the man in the black hat who approached the check-in window, while the man in the red hat was the same individual as Suspect 1 from the Topanga Caregivers robbery.

started to ask defendant for his patient information when defendant mumbled something and pulled out a gun.[6] Tanis recalled that he put up his hands and started to say something like "Listen, I don't want any trouble," but before he finished that statement, he "tried to spin out of the chair as quick as I could and get to the exit in the hallway."

Tanis did not clearly see the person's face who pulled the gun. As he ran he heard a pop and felt a sensation in his right arm. He yelled at his other employees to go into the back room, and then tried to close the door but realized he could not use his right arm. Once they reached the back room, Tanis looked at the security camera and saw the red Mercedes pulling out of the parking lot.

Tanis was hospitalized for three days. The bullet entered his mid-back two inches to the left of his spine and lodged in his arm with no exit wound. The damage from the bullet required insertion of a metal rod into his arm, which limited his arm mobility and caused him pain.

A fingerprint investigator from the Los Angeles Police Department (LAPD) lifted four latent prints from the customer counter at the check-in desk at West Valley. One of the partial palm prints matched defendant's left palm print.

3. *Defendant's Arrest and Interview*

On September 2, 2009, LAPD officers pulled over a red Mercedes matching the description of the car involved in the incident at West Valley. Defendant, who was the registered owner of the car and was driving at the time, was arrested. Investigating LAPD detective Pam Pitcher searched the car the following day. She found a pair of red basketball shorts in the back seat that appeared to match those worn by Suspect 4 on May 23, 2009.

Detective Pitcher and her partner interviewed defendant on September 2, 2009 after he waived his *Miranda*[7] rights. A partially-redacted video of the interview was

---

[6]Tanis testified at the preliminary hearing and at trial that he heard mumbling. But he acknowledged he told the police on August 25, 2009 that he heard someone say something like "What's up, mother fucker?"

[7]*Miranda v. Arizona* (1966) 384 U.S. 436.

played at trial.  Defendant agreed to review photos of other individuals but asked to call his mother before identifying anyone or providing further information about other suspects.  After the detectives showed him a number of photos, defendant asked what he was being charged with.  Detective Pitcher said she believed defendant was involved in three robberies of medical marijuana dispensaries.  Defendant replied "Never.  No way.  I swear to God to you.  No way."  Pitcher then showed defendant two photographic stills from surveillance video of Topanga Caregivers and West Valley.  In response to each photo, defendant replied, "Okay.  What else?"  Detective Pitcher then showed a third photo from an uncharged robbery, stating she thought that one "was close."  Defendant responded, "That's not me."

## DISCUSSION

### A.    *Attempted Robbery*

Defendant challenges only one aspect of his conviction on appeal.  Specifically, he contends that there was insufficient evidence to support his conviction on count 5 for attempted robbery at the West Valley dispensary.  We disagree.

#### 1.    *Legal Principles*

In reviewing a challenge to the sufficiency of the evidence, we "review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  Thus, a "reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict.  [Citation.]" (*Ibid.*)

8

The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Accordingly, we "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*Ibid.*)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission. [Citations.]" (*People v. Medina* (2007) 41 Cal.4th 685, 694; see also § 21a.) "The crime of attempted robbery requires neither the commission of an element of robbery nor the completion of a theft or assault." (*People v. Lindberg* (2008) 45 Cal.4th 1, 28 [citing *People v. Medina*, supra, 41 Cal.4th at p. 694].)

2.      *Substantial Evidence Supports Jury's Verdict*

Defendant contends that "the facts underlying [his] conviction rest squarely on [his] drawing the gun" and pointing it at Tanis at the West Valley dispensary on August 15, 2009. Thus, while he admits the evidence supports his conviction for assault with a firearm, he argues it does not establish beyond a reasonable doubt that he intended to commit a robbery at West Valley.

Numerous cases have found sufficient evidence to support a reasonable inference that the defendant intended to commit a robbery even where there was no express demand for money or other direct statement of intent. In *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128, for example, the defendant and his companion, armed with a knife and a tire iron, rushed into the victim's apartment and began attacking the victim and his brother. During the course of the attack, defendant's companion asked the victim, "where do you have it?"; the victim assumed "it" meant money or drugs and responded that "it" was in the closet. (*Ibid.*) The suspects fled when the telephone began ringing. (*Id.* at pp. 1128-1129.) The California Supreme Court rejected defendant's challenge to the sufficiency of the evidence, finding that "[e]ven though the attackers were not specific in demanding money or drugs, the totality of circumstances . . . clearly justified

9

the jury's determination that an attempted robbery and burglary had taken place. (See, e.g., *People v. Jackson* (1963) 222 Cal.App.2d 296, 298 [attempted robbery conviction upheld where evidence established that defendant entered store, pointed a gun at store operator, and said only, 'This is it.']; *People v. Gilbert* (1963) 214 Cal.App.2d 566, 567-568 [where two armed men appeared in market shortly after closing time and simultaneously displayed their weapons, one pointing at proprietor near cash drawer and the other herding remaining occupants to rear room, lack of phrase such as 'this is a stickup' or 'hand over your money' does not bar the reasonable inference that a forceful taking of property was intended].)" (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1129-1130.) The court similarly upheld the conviction in *People v. Banks* (2014) 59 Cal.4th 1113, 1156-1157, overruled in part on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3, based on evidence that defendant interacted with the victim at an ATM for approximately 25 seconds before raising his gun to fire, including touching the victim's arm, brandishing his gun, and standing near the victim as he attempted to use the ATM. And in *People v. Lindberg*, *supra*, 45 Cal.4th at p. 29, the Supreme Court concluded that "the jury reasonably could have found that defendant harbored an intent to steal Ly's property when he knocked Ly to the ground, demanded to know whether he had a car, and put his knife to his throat before asking him again whether he had a car."

Here, there was evidence at trial that defendant and his accomplices committed a robbery of Topanga Caregivers by approaching the dispensary appearing to be legitimate patients, then confronting the check-in employee with a gun. Four months later, defendant, again accompanied by Suspect 1, approached the West Valley dispensary in the same manner, pointed a gun at Tanis at the check-in window, and fired when Tanis attempted to flee. Given the totality of these circumstances, a jury could reasonably infer that defendant intended to rob West Valley, even absent an express verbal declaration of that intent at the time.

Moreover, the fact that defendant did not actually take any property from the dispensary and instead fled the scene does not defeat the jury's finding that defendant attempted to commit the robbery. As noted above, it is well-settled that a completed theft

10

is not required for attempted robbery.  (*People v. Lindberg, supra,* 45 Cal.4th at p. 30; *People v. Medina*, *supra*, 41 Cal.4th at p. 694.)  From the evidence presented, the jury could have reasonably inferred that defendant intended to commit a robbery at the dispensary but fled after shooting Tanis, knowing that Tanis or another employee would call the police.  (See *People v. Banks, supra,* 59 Cal.4th at pp. 1156-1157; *People v. Zapien* (1993) 4 Cal.4th 929, 984 [affirming a jury's reasonable inference that the defendant fled without completing the robbery because he knew someone had telephoned the police].)  Finally, as the Attorney General points out, no evidence suggests defendant had any motive for pulling out a gun at the dispensary for any other purpose—for example, there was no evidence that defendant knew Tanis or had ever visited the dispensary before.  As such, substantial evidence supports defendant's conviction on count 5.

       B.     *Imposition of Consecutive Sentences*

Defendant also contends the trial court abused its discretion in imposing consecutive sentences on counts 1 through 4.  He argues the court failed to adequately consider the mitigating factors in his case, including that counts 1 through 4 were based on a single incident at Topanga Caregivers and thus constituted "a single period of aberrant behavior," as well as defendant's youth (he was 19 years old at the time of the crimes) and minimal prior record, as balanced against the length of the entire sentence imposed.

The decision to impose consecutive or concurrent sentences belongs to the sentencing court.  (§ 669; *People v. Gray* (1986) 176 Cal.App.3d 520, 523-524.)  In deciding to impose consecutive sentences, the court looks to the factors in California Rules of Court, rule 4.425 (rule 4.425), including, as relevant here, the fact that the crimes involved "separate acts of violence or threats of violence."  (Rule 4.425(a).)  The court also may consider any other circumstances in mitigation or aggravation not relied upon to impose an upper term or otherwise enhance a sentence.  (Rule 4.425(b).)  "Only one criterion or factor in aggravation is necessary to support a consecutive sentence. [Citation.]"  (*People v. Davis* (1995) 10 Cal.4th 463, 552.)

11

Defendant's sole claim of sentencing error is that the trial court failed to "fairly consider" his mitigating factors under rule 4.425. This contention is not borne out by the record. At the sentencing hearing, the court heard statements by defendant's family and argument by counsel. The court also inquired whether defendant wished to be heard, but he declined. The court expressly stated it considered defendant's minimal prior record as a mitigating factor. In rendering consecutive terms on counts 1 through 4, the court explained its reasoning, concluding: "These crimes involve separate acts of violence and threats of violence within the meaning of Rule of Court 4.425, which justifies a consecutive sentence. It involved the threat of great bodily injury or great bodily harm. They involve a high degree of cruelty, viciousness and callousness. These victims were highly vulnerable, as well, as they were doing their jobs, trying to get through the day at the dispensary, and certainly were not looking for any trouble." The court further noted that the crimes "were obviously planned out in advance, indicating a degree of sophistication and professionalism. And I do believe that Mr. Brown's conduct clearly represents a significant danger to society."

It is clear from the court's statements that it found the offenses in counts 1 through 4 involved separate acts of violence, on which it could reasonably base the imposition of consecutive sentences under rule 4.425. Moreover, the court identified several aggravating factors that further justified consecutive terms: the offenses involved the threat of great bodily injury, the victims were particularly vulnerable, the manner in which the robberies were carried out indicated "planning, sophistication, or professionalism," and defendant's violent conduct "indicates a serious danger to society." (Cal. Rules of Court, rule 421(a)(1), (3), & (8), 421(b)(1) [circumstances in aggravation].) Defendant does not dispute that these were appropriate factors for the court to consider. While he suggests the court should have weighed his mitigating factors

12

more heavily, he has not demonstrated any abuse of discretion in the trial court's determination.[8]

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

---

[8]Defendant's citation to *People v. Caballero* (2012) 55 Cal.4th 262 is inapposite, as that case involves a juvenile defendant sentenced to 110 years to life (effectively life without the possibility of parole).